## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

| | | |
|---|---|---|
| JOY PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| CITY OF ELKHART, KRIS SEYMORE, | ) | |
| DAN MILANESE, TRAVIS HAMLIN, | ) | |
| ANDREW WHITMYER, SCOTT | ) | |
| CLAYBAUGH, JAMES WRATHEL, | ) | |
| MICHAEL VANSCOIK, DENISE | ) | **JURY TRIAL DEMANDED** |
| HOUSER, DUSTIN YOUNG, | ) | |
| BRANDON ROUNDTREE, VICKI E. | ) | |
| BECKER, in their individual | ) | |
| capacities, and the STATE OF | ) | |
| INDIANA. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, JOY PHILLIPS, by her undersigned attorneys, complain of

Defendants, CITY OF ELKHART, KRIS SEYMORE, DAN MILANESE, TRAVIS

HAMLIN, ANDREW WHITMYER, SCOTT CLAYBAUGH, JAMES WRATHEL,

MICHAEL VANSCOIK, DENISE HOUSER, BRANDON ROUNDTREE, VICKI E.

BECKER, and DUSTIN YOUNG in their individual capacities, and the STATE OF

INDIANA as follows:

### Introduction

1.    Plaintiff, Joy Phillips, became a police officer nearly 25 years ago.

2.      Since then, Plaintiff has worked tirelessly to protect and serve the community.

3.      Plaintiff took her oath to protect and serve and to uphold the constitutional rights of citizens seriously.

4.      In 2016, Plaintiff was hired by Defendant City to work at the Elkhart Police Department.

5.      At the time of her hiring, Plaintiff was unaware that the Elkhart Police Department engaged in and enabled egregious police misconduct.

6.      Come to find out, the Elkhart Police Department is one of the most corrupt law-enforcement agencies in America.

7.      After being hired, Plaintiff performed remarkably well in her duties at the Elkhart Police Department.  Because of this, Plaintiff was promoted to the Detective Bureau by September 2017.

8.      Between 2016 and 2022, Plaintiff's performance reviews were exemplary.

9.      So much so, in fact, that Plaintiff was interviewed by Mayor Neese in December 2018 and Mayor Roberson in March 2020 to be Elkhart's new Chief of Police.

10.      Although Plaintiff was passed over for Chief, she still planned to retire as a law-enforcement officer at the Elkhart Police Department.

11.       Due to a series of events that began in July 2022, Plaintiff's life and career were turned upside down.

2

12.     On July 14, 2022, Plaintiff was instructed by Defendants Roundtree and Whitmyer to write an illegal search warrant.

13.     Plaintiff refused to commit a crime and engage in egregious police misconduct.

14.     Instead, Plaintiff asserted her First Amendment right to free speech, informing Defendants Roundtree and Whitmyer that she "will not do anything illegal, unethical, or immoral" and was "willing to take the write up for refusing to do something when [she was] within [her] right to refuse."

15.     In asserting her First Amendment right, Plaintiff informed Defendants Roundtree and Whitmyer that she would not sign an illegal search warrant and would not commit police misconduct.

16.     Plaintiff's assertion of her First Amendment rights cost her everything.

17.     Defendants retaliated against Plaintiff by trying to end her career as a police officer.

18.     In doing so, Defendants violated Plaintiff's constitutional rights.

19.     First, Defendants caused Plaintiff to be disciplined with a three-day suspension without any legitimate justification for doing so.

20.     Plaintiff challenged the illegitimate three-day suspension through Defendant City's formal grievance process.

21.     In October 2022, Plaintiff testified before the Board of Public Safety regarding the egregious misconduct that she witnessed.  In doing so, Plaintiff again asserted her First Amendment right to free speech when testifying that additional

police misconduct was ongoing within the Elkhart Police Department. Additionally, Plaintiff revealed that Defendant Young was labeled as a *"Brady"* Officer, meaning his name was on a list of officers who have credibility issues that must be disclosed to defendants in criminal prosecutions.

22.     When she did so, Defendants again retaliated against Plaintiff for invoking her First Amendment right to free speech.

23.     Notably, Elkhart County's elected prosecutor, Defendant Becker, was present for Plaintiff's testimony before the Board of Public Safety.

24.     Defendant Becker joined Defendants' conspiracy to violate Plaintiff's constitutional rights.

25.     Defendant Becker retaliated against Plaintiff for asserting her First Amendment right to free speech and publicly revealing allegations of police misconduct within Elkhart.

26.     By 2022, Defendant Becker developed friendships with Elkhart officers accused of misconduct, including officers now known to be *Brady* officers.

27.     By 2022, Defendant Becker had testified in the wrongful conviction lawsuit of *Mack Sims v. City of Elkhart, et al.,* that the Elkhart County Prosecutor's Office did not maintain a *Brady* list and did not refer to officers as *Brady* officers.

28.     In response to media inquiries and public records requests, Defendant Becker maintained that the Elkhart County Prosecutor's Office did not maintain a *Brady* list and did not refer to officers as *Brady* officers.

29.    Plaintiff's public testimony exposed Defendant Becker's coverup of police misconduct.

30.    Defendant Becker entered into a conspiracy with other Defendants to retaliate against Plaintiff.

31.    As part of this retaliation, Defendant Becker wrote a letter to Defendant City that caused serious harm to Plaintiff's career.  Defendant Becker drafted this letter without speaking to any witness, reviewing any investigative file, or conducting any investigation.

32.    Defendant Becker wrote this letter in retaliation for Plaintiff exercising her First Amendment right to free speech.

33.    After receiving Defendant Becker's letter, Defendant City sought Plaintiff's unjustified termination from the Elkhart Police Department.

34.    All told, Defendants conspired to end Plaintiff's career after she asserted her First Amendment right to free speech.

35.    Defendants did so to try to keep under wrap the egregious misconduct that takes place within the Elkhart Police Department.

36.    Defendants' violation of Plaintiff's constitutional rights has irreparably damaged her career as a law-enforcement officer.

37.    Due to Defendants' misconduct, Plaintiff struggles to survive.

38.    Even more, as part of the existing conspiracy, Defendant Wrathel has engaged in severe intimidation of Plaintiff since she was forced from the Elkhart Police Department, causing additional emotional and mental distress.

39.     This lawsuit seeks to bring the injustice that happened to Plaintiff to light so that it will never occur again.

## Jurisdiction

40.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and Title VII of the Civil Rights Act.

41.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and § 1343.

42.     Venue is proper under 28 U.S.C. § 1391(b).  The majority of Defendants reside in this district and the events and omissions giving rise to Plaintiff's claims occurred in this district.

## Parties

43.     Plaintiff Joy Phillips is a 46-year-old woman who resides in Granger, Indiana.

44.     At all times relevant hereto, Defendants KRIS SEYMORE, DAN MILANESE, TRAVIS HAMLIN, ANDREW WHITMYER, MICHAEL VANSCOIK SCOTT CLAYBAUGH, JAMES WRATHEL, BRANDAN ROUNDTREE, DENISE HOUSER, DUSTIN YOUNG (hereinafter "Defendant Officers"), were police officers in the Elkhart Police Department.  All are sued in their individual capacities and acted under color of law and within the scope of their employment during the investigation at issue.

45. The Defendant Officers were each white officers, primarily male, with the Elkhart Police Department.

46. Defendant City of Elkhart is a municipal corporation under the laws of the State of Indiana. The City of Elkhart is liable for all torts committed by the Defendant Officers while employed by the City of Elkhart pursuant to the doctrine of *respondeat superior*. Defendant City of Elkhart is additionally responsible for the official policies of the Elkhart Police Department. The City of Elkhart is or was the employer of each of the Defendant Officers.

47. Vicki Becker served as a deputy prosecutor in Elkhart County from 1998 until 2016, when she was elected Elkhart County Prosecutor. Since then, Defendant Becker has been the elected Elkhart County Prosecutor. She is sued in her individual capacity and acted under color of law and within the scope of her employment during the investigation at issue. At the time of her involvement, Ms. Becker's employment would fall under the purview of the State of Indiana.

48. At all times relevant to this action, each of the named individual Defendants acted individually and/or collectively, under the color of the laws, regulations, and customs of the State of Indiana. Each Defendant's actions constituted "state action" as defined under federal law.

### Factual Background

49. In April 1999, Plaintiff became a sworn law-enforcement officer and dedicated her life and well-being to protecting and serving the community.

50.    In July 2016, Plaintiff was employed by Defendant City as a law-enforcement officer with Defendant City of Elkhart.

51.    In 2022, Plaintiff had been a law-enforcement officer for 24 years.

52.    By 2022, Plaintiff worked as a Detective in the Sex Crimes division of the Elkhart Police Department.

53.    Plaintiff was never disciplined between 2016 and 2022 as an Elkhart Police Officer.

54.    That's because Plaintiff complied with the policies, procedures, and training in place at the Elkhart Police Department.

55.    Prior to Defendants' misconduct, Plaintiff had a positive and productive career in law-enforcement.

56.    In fact, Plaintiff received several Partnership with Community Awards.  She also received awards for saving the lives of those she served.  And while at another law-enforcement agency, Plaintiff received the South Bend Accommodation Award.

57.    Plaintiff's personnel file reflects her dedication to the community and contains a significant number of accolades, including letters from the community and other law-enforcement officers for her outstanding work and performance.

58.    Throughout her career, Plaintiff built a reputation based on her honesty, integrity, and willingness to put her life on the line to protect and serve those in her community.

## Between 2016 and 2023, Plaintiff Witnessed and Refused to Participate Police Misconduct at Defendant City

59.    While Plaintiff was employed at the Elkhart Police Department, other officers were allowed to commit egregious police misconduct with impunity.

60.    In some instances, Elkhart officers violated the constitutional rights of Elkhart citizens without discipline.

61.    This egregious misconduct by Elkhart officers led to the widespread violation of citizens' constitutional rights.

62.    In other instances, Elkhart officers violated criminal laws, and even then, were not terminated by Defendant City.

### The Lanzen's Criminal Acts

63.    In June 2021, Sgt Nathan and Cpl Taryn Lanzen appaeared before the Police Merit Commission for defrauding an elderly Elkhart citizen.

64.    Defendant City did not terminate either officer.

65.    Defendant Becker and the Elkhart County Prosecutor's Office did not criminally prosecute either officer.

### Dolshenko's Criminal Acts

66.    In June 2023, Cpl Lenny Dolshenko crashed his motorcycle while intoxicated.  Defendant City did not terminate Officer Dolshenko and covered up his misconduct.

67.    Defendant City did not terminate Officer Dolshenko.

68.    Instead, Defendant City allowed Officer Dolshenko to retire for medical reasons, thus qualifying him to receive a pension from the Elkhart Police Department.

69.    Defendant Becker did not criminally prosecute Dolshenko for DUI related offenses.

### Defendants Retaliate Against Plaintiff in July 2022

70.    On July 14, 2022, Defendant Roundtree directed Plaintiff and three male colleagues at the Elkhart Police Department to write and sign a search warrant affidavit.

71.    Defendant Roundtree ordered Plaintiff to write an illegal search warrant.

72.    Defendant Whitmyer was with Defendant Roundtree when he ordered Plaintiff to write an illegal search warrant.

73.    By then, Plaintiff was the fourth officer requested to sign the search warrant.  The three officers before her – all white males – refused to sign the warrant.

74.    Plaintiff refused to sign the warrant because there was not probable cause to do so.

75.    Plaintiff expressly informed Defendants Roundtree and Whitmyer that there was not probable cause to sign the warrant.

76.    Plaintiff made it clear that she would not fabricate evidence.

77.    Plaintiff asserted her First Amendment right in doing so.

78.    Specifically, Plaintiff stated "I will not do anything illegal, unethical or immoral and I'm willing to take the write up for refusing to do something when I am within my right to refuse."

79.    In response to Plaintiff's assertion of her First Amendment rights, Defendant Roundtree threatened Plaintiff that she would be demoted from her detective position to patrol if she pushed the issue any further.

**Defendant Whitmyer Commits Egregious Misconduct**

80.    Joining the conspiracy to retaliate against Plaintiff, Defendant Captain Whitmyer told Plaintiff to "stop protecting fucking crackheads!"

81.    Defendants' mentality is consistent with the pattern and practice of white Elkhart officers conspiring to violate the constitutional rights of black Elkhart citizens.

82.    Like the other Defendant Officers, Defendant Whitmyer is a white male.

83.    Defendant Whitmyer is the current Assistant Chief of Police at the Elkhart Police Department.

84.    Defendant Whitmyer's reference to people of color in the Elkhart community as "crackheads" is evidence supporting the widespread racial discrimination at Defendant City and within the Elkhart Police Department.

85.    As discussed below, the Elkhart Police Department has a pattern and practice of discriminating, targeting, and violating the constitutional rights of people of color.

**At the Behest of Supervisors, Another Elkhart Officer Commits Egregious Misconduct, Fabricates Evidence, and is Promoted**

86.     Without probable cause, and with multiple officers refusing to sign a search warrant, Plaintiff then witnessed another Elkhart officer, Michael VanScoik, force the door to a building open without a warrant.

87.     After Officer VanScoik forced the door open without a warrant and without legal justification for doing so, he falsely stated in his official report that the door was ajar.

88.     Officer VanScoik's report is a fabrication regarding the door being ajar.

89.     Even though Officer VanScoik opened the door without legal justification for doing so, and then fabricated a portion of his report to coverup the misconduct, he has since been promoted to Sergeant at the Elkhart Police Department.

90.     The failure to discipline Officer VanScoik coupled with his recent promotion is an example of the widespread culture of misconduct within the Elkhart Police Department.

**Plaintiff's Revelations of Misconduct to Leadership Within the Elkhart Police Department Are Not Just Ignored, But Rather, Provoke Retaliation**

91.     Plaintiff reported egregious police misconduct to all Captains at the Elkhart Police Department.

92.     During her Captain's Review Board hearing, Plaintiff proffered evidence regarding the misconduct described above.

93.    Plaintiff also reported the misconduct described above to Defendant Seymore on August 16, 2022.

94.    After exercising her First Amendment rights and refusing to violate the constitutional rights of Elkhart citizens, Plaintiff was disciplined without any legitimate justification.

## Plaintiff's Discipline Was Unjustified

95.    Plaintiff received a three-day suspension.

96.    None of Plaintiff's male coworkers who also refused to sign the search warrant were disciplined.

97.    Defendants discipline of Plaintiff was clear retaliation based on the assertion of her First Amendment right to free speech.

98.    That the other male coworkers who refused to sign the illegal search warrant were not subjected to discipline is evidence of the widespread discrimination that exists within the Elkhart Police Department.

## Plaintiff is Retaliated Again After Testifying Publicly Regarding Police Misconduct and the Withholding of Sustained Allegations of Misconduct

99.     Since the discipline violated her constitutional rights, Plaintiff filed a grievance.

100.    As part of the grievance process, the Elkhart Board of Public Safety held a hearing on October 11, 2022 and October 25, 2022.

101.    At that hearing, Plaintiff presented evidence demonstrating that discipline was not warranted.

102.    Plaintiff also testified to witnessing egregious police misconduct at the Elkhart Police Department.

103.    Plaintiff testified that she was ordered to violate the constitutional rights of Elkhart citizens.

104.    Plaintiff testified that she was ordered to sign a search warrant affidavit under oath without probable cause to do so.

105.    Plaintiff testified that when she refused to sign a search warrant without probable cause, Defendant Whitmyer instructed her to "stop protecting fucking crackheads."

106.    Plaintiff testified to witnessing Elkhart police officers violate the constitutional rights of Elkhart citizens.

107.    Plaintiff testified that Defendant Sgt. Dustin Young was referred to as a "*Brady*" officer due to his credibility issues.

108.    Plaintiff exercised her First Amendment rights when testifying before the Board of Public Safety.

109.    Defendants, including Defendant City, were outraged that Plaintiff exposed police misconduct in a public forum.

110.    Defendant Becker even attempted to stop the Board of Public Safety from live streaming the hearing to keep it hidden from public view.

111.    Defendants then conspired with one another again to retaliate against Plaintiff for exercising her First Amendment right to freedom of speech.

14

**Defendant Becker, a Corrupt Prosecutor, Has a Pattern and Practice of Withholding Sustained Allegations of Misconduct Against Elkhart Officers**

112.   In 2023, Defendant Vicki Becker was the elected Elkhart County Prosecutor.

113.   Defendant Becker's pattern of withholding sustained allegations of misconduct violated scores of defendants' constitutional rights and resulted in the wrongful convictions of innocent men and women.

114.   Defendant Becker's withholding of sustained allegations of misconduct began unraveling several years ago in the wrongful conviction case of Andrew Royer.

115.   In 2021, the Indiana Court of Appeals found that the State violated the constitutional rights of Mr. Royer by not disclosing sustained allegations of misconduct against former Elkhart Detective Carlton Conway.

116.   In that opinion, the court found that Defendant Becker "knew by the time of Royer's trial that Detective Conway had been removed from the homicide unit" and that the failure to "disclose Detective Conway's removal from the homicide unit calls into question the integrity of Royer's conviction and requires a new trial." *State v. Royer*, 166 N.E.3d 380, 401 (Ind. Ct. App. 2021).

117.   Defendant Becker's practice of withholding exculpatory and impeachment evidence in criminal prosecutions, especially sustained allegations of misconduct against Elkhart police officers, is directly related to her motive to retaliate against Plaintiff.

**Defendant Becker Retaliates Against Plaintiff for Exercising her First
Amendment Rights and Exposing Police Misconduct**

118.    Defendant Becker was present for Plaintiff's 2022 hearing before the
Board of Public Safety.

119.    Defendant Becker did not normally attend Board of Public Safety
hearings.

120.    Defendant Becker attended the hearing at the request of Defendant
City.

121.    Defendant Becker admits that she was concerned about information
from the investigation being discussed in a public forum "and how that may taint
future evidence that would come in."

122.    The investigation Defendant Becker was concerned about was the one
in which Plaintiff refused to take illegal actions at the request of her supervisors
and sign a false and fabricated search warrant.

123.    Defendant Becker was also concerned that the police misconduct would
be "disseminated to the public."

124.    Defendant Becker witnessed Plaintiff exercise her First Amendment
rights and testify to the existence of police misconduct in the investigation involving
the search warrant affidavit.

125.     Defendant Becker witnessed Plaintiff exercise her First Amendment
rights and testify to the existence of additional police misconduct in the Elkhart
Police Department.

126.    Defendant Becker witnessed Plaintiff assert her First Amendment rights and testify that Sgt. Dustin Young was labelled as a "*Brady*" officer by Elkhart prosecutors and the Elkhart Police Department.

127.    Plaintiff's assertion of her First Amendment right when exposing misconduct angered Defendant Becker.

128.    Plaintiff's revelation of Sgt. Young being referred to within the Elkhart County Prosecutor's Office as well as the Elkhart Police Department as a "Brady" officer also angered Defendant Becker.

129.    Plaintiff's testimony also placed Defendant Becker in serious jeopardy.

130.     Specifically, Defendant Becker previously testified under oath that the Elkhart County Prosecutor's Office does not: (1) keep a list of officers who have credibility issues; and (2) refer to officers with credibility issues as *Brady* officers.

131.    Due to Plaintiff exercising her First Amendment right, Defendant Becker conspired with other Defendants to retaliate against her.

132.    As part of this retaliation, by October 28, 2022, Defendant Becker wrote a letter to Defendant Seymore that was designed to end Plaintiff's career.

133.    The only thing Defendant Becker did do before writing the letter was speak to Defendant Seymore.

134.    After her conversation with Defendant Seymore, Defendant Becker wrote a letter designed to end Plaintiff's career in law-enforcement.

135.    By then, Defendant Becker had fully agreed to join Defendants' conspiracy to retaliate against Plaintiff.

136.    Defendant Becker wrote this letter even though she was "not familiar with the subject matter of the facts and the opinions that she was talking about."

137.    By the time she wrote this letter, Defendant Becker "had not reviewed the underlying investigation.  It had not been submitted for my – or our review at that time."

138.    Defendant Becker had no firsthand knowledge of the underlying investigation that Plaintiff – and her colleagues – testified about.

139.    She did not review any exhibits, or speak to a single witness before writing the letter.

140.    Defendant Becker's letter unjustifiably labeled Plaintiff as having a reputation for dishonesty within the Elkhart Police Department.  In short, in retaliation for Plaintiff asserting her First Amendment rights, Defendant Becker unjustifiably labeled her as a "Brady" officer, which will follow her the rest of her career and prevent her from being able to testify against criminal defendants.

141.    To this day, Plaintiff has been unsuccessful in regaining employment in law-enforcement.

142.    Defendants, including Defendant City, then used Defendant Becker's letter to unjustifiably seek Plaintiff's termination.

**Certain Defendants Physically Attack and Confine Plaintiff as Part of Their Conspiracy to Violate Plaintiff's Constitutional Rights**

143.    After receiving Defendant Becker's letter, and prior to Plaintiff's termination, Defendant Seymore summoned Plaintiff to his office and placed Plaintiff on indefinite administrative leave on November 1, 2022.

18

144.   Defendant Seymore ordered Plaintiff to surrender her gun and badge.

145.   Defendant Seymore then ordered Defendant Whitmyer to accompany Plaintiff to her office so she could remove her personal effects before escorting her from the Elkhart Police Department.

146.   Defendant Hamlin met Defendant Whitmyer and Plaintiff at her office.

147.   There, Plaintiff removed her personal property.

148.   Plaintiff's personal property included an audio recording device.

149.   Realizing that Plaintiff may have recorded police misconduct, Defendant Whitmyer ordered Plaintiff to turn over the recording device.

150.   Plaintiff refused to provide Defendant Whitmyer with her personal recording device.  Plaintiff revealed it was her personal property and that Defendant Whitmyer had no right to seize it.

151.   Defendant Whitmyer then assaulted Plaintiff.

152.   Defendant Whitmyer then confined Plaintiff without her permission and justification.

153.   Defendant Hamlin was present and also barricaded Plaintiff's office door with Defendant Whitmyer.

154.   The photograph below depicts Defendants Whitmyer and Hamlin barricading Plaintiff inside her office.



155.    At some point, Defendant Whitmyer grabbed Plaintiff's backpack,

and informed her she could not leave the building until he inspected her

backpack, and she surrendered her recording device.

156.   Defendant Whitmyer's actions were done as part of a conspiracy with the other Defendants to violate Plaintiff's constitutional rights and hide evidence of misconduct at the Elkhart Police Department.

157.   Defendant Whitmyer then recruited additional Defendants to violate Plaintiff's constitutional rights by confining Plaintiff against her will.

158.   At Defendant Whitmyer's request, Defendants Wrathell, Hamlin, and Claybaugh joined the conspiracy to violate Plaintiff's constitutional rights.

159.   Defendants Wrathell, Hamlin, Claybaugh joined Defendant Whitmyer in confining Plaintiff against her will.

160.   None of the Defendants had the right nor justification to confine Plaintiff.

161.   After approximately 25 minutes, Plaintiff was able to slide her body between Defendants to exit the office.

162.   When she did so, Defendant Whitmyer again attempted to take Plaintiff's backpack.

163.   As she did so, Defendant Claybaugh ran to another door to block her once again.

164.   Defendant Claybaugh is a large human being.  He is much larger than Plaintiff, weighing somewhere around 300 pounds.

165.   Claybaugh managed to block the door and confine Plaintiff against her will at the Elkhart Police Department.

166.    Eventually Plaintiff was able to escape Defendant Claybaugh's confinement and leave the building.

167.    Defendants Whitmyer, Claybaugh, Wrathell, and Hamlin illegally detained Plaintiff for approximately 45 minutes within the Elkhart Police Department.

168.    Defendant Seymore admits that he ordered Defendants Whitmyer, Hamlin, Claybaugh, and Wrathel to confine Plaintiff.

169.    Defendants Whitmyer, Claybaugh, Wrathell, and Hamlin violated Plaintiff's constitutional rights when doing so.

170.    Defendants Whitmyer, Claybaugh, Wrathell, and Hamlin confined Plaintiff against her will as part of a conspiracy to violate Plaintiff's constitutional rights.

171.    After an investigation, the Indiana State Police recommended the authorization of criminal charges to Defendant Becker and the Elkhart County Prosecutor's Office.

172.    Given that Defendant Becker was part of the conspiracy to retaliate against Plaintiff, she declined to authorize charges.

### Defendant City Terminates Plaintiff in Violation
### of Her Constitutional Rights

173.    Defendants Seymore and Milanese illegitimately and falsely charged Plaintiff with multiple incidents of misconduct, most of which consisted of statements Plaintiff made before the Board of Public Safety in 2022.

174.    Defendants Seymore and Milanese sought Plaintiff's termination

from the Elkhart Police Department without any legitimate justification.

175.   Plaintiff was then illegitimately and indefinitely suspended from her duties at the Elkhart Police Department.

176.   At the time of her suspension, Plaintiff was meeting the legitimate expectations of Defendant City in that she had not been previously disciplined or received a negative performance evaluation.

177.   Nonetheless, Defendants sought termination due to Plaintiff exercising her First Amendment right to freedom of speech when she exposed egregious police misconduct taking place within the Elkhart Police Department.

178.   In 2023, Defendant City's Police Merit Commission ("PMC") held a hearing regarding Defendants' termination request.

179.   Defendant City's PMC hearing was a sham proceeding.

180.   Defendant City violated Plaintiff's due process rights when it refused to provide discovery prior to the 2023 Board of Public Safety hearing.

181.   Defendant City violated Plaintiff's due process rights when it refused to present witnesses under Defendant City's control for depositions prior to the 2023 Board of Public Safety hearing.

182.   Defendant City violated Plaintiff's due process rights when it refused to present witnesses under Defendant City's control for the 2023 Board of Public Safety hearing.

183.   Plaintiff's testimony at the hearing was truthful and supported by evidence.

184.    Nonetheless, Plaintiff was terminated by the Elkhart Police Merit Commission at the request of Defendants Seymore and Milanese.

**Defendant City of Elkhart Has A Pattern and Practice
of Systemic Police Misconduct**

185.    As described above, Plaintiff was retaliated against for exercising her First Amendment right and revealing that egregious police misconduct continues to exist at the Elkhart Police Department.

186.    Defendant City of Elkhart has a longstanding pattern and practice of police misconduct.

187.    Dating back to 1993, the Board of Public Safety issued a report "Regarding [the] Investigation of Police Officers Found Liable by a U.S. District Court of Using Excessive Force." The Board of Public Safety's 1993 report found that some of the officers used "brutality," and more importantly, that the Department failed to implement proper discipline of officers who commit misconduct.

188.    The Board not only expressed frustration regarding efforts to hamper the City Administration's investigation attempts, but it likewise set forth the Report's goal: "to eradicate brutality as practiced by some of our police officers." The Board linked this misconduct to the Elkhart Police Department failing to properly implement progressive discipline of officers. The Board reasoned that, "[a]ctually if progressive, corrective discipline had been practiced in the cases of Hill and Ambrose[,] either they would be cops today who know how to follow proper procedure or they would not be working here. We tend to believe that failure to

24

point out weakness early in the officers career does no one a favor…"

189.    The Board of Public Safety reiterated that "[t]he problem appears to be in a system that is secured in privacy and protected by a code of silence further protected by state law…"

190.    The Board recommended that "the Department must find a way to better conduct internal investigations."

191.    By 2023, these reforms were still not implemented, thus allowing Defendants to continue committing misconduct without fear of any meaningful discipline or consequences.

192.    Defendant City's failure to implement and follow proper policies and procedures enabled Defendants to retaliate based on Plaintiff exercising her First Amendment right to free speech.

193.    To this day, systemic misconduct and a code of silence exists at the Elkhart Police Department.

194.    This custom, pattern, and practice of police misconduct contributed to the wrongful convictions of Keith Cooper, Christopher Parish, Mack Sims, Lana Canen, DeWayne Dunn, and Andrew Royer.

195.    It likewise contributed to scores of other wrongfully convicted individuals who remain incarcerated to this day.

**The Systemic Police Misconduct at the Elkhart Police Department Enabled a Group of Officers to Create a Gang Referred to as "the Wolverines," Who Were Known to Prey on People of Color**

196.    As Plaintiff reveals, the Elkhart Police Department remains one of the most corrupt law-enforcement agencies in America.

197.    It has been this way for decades on end.

198.    For instance, by the early 1990's, the culture of misconduct within the Elkhart Police Department was so rampant that a number of all white officers formed a group called the "Wolverines."

199.    This group was well-known to others within the Elkhart Police Department, including the Chief of Police: J.J. Ivory.  According to Mr. Ivory, the Wolverines were a "group of officers, mostly FOP [Fraternal Order of Police] members -- or possibly all of them were members of the FOP during that time frame, -- and they were of the consensus, of a belief of "One for all and all for one" as far as their dealings with citizens of Elkhart, especially the people in the south-central side of Elkhart."

200.    As former Chief Ivory understood, this meant that Wolverines "would all stick together and regardless on whatever the issue might be, and that whatever it took, more or less, made me feel they would lie, cheat, defraud, or whatever it took to uphold their cause." The Wolverines likewise followed their own code of silence.

201.    Members of the Wolverines included "officers who were alleged to be racist and belonging to possibly subversive groups," like the Ku Klux Klan.

202.   Mr. Ivory discovered the Ku Klux Klan involvement as he heard "people just idly chitchatting, making comments, saying that we had officers who were card-carrying members of the [KKK at the] Elkhart Police Department…" Confirming their prejudices, Mr. Ivory heard members of the Wolverines use racial slurs:

> I heard some of the members use the "N" word when they didn't know I was around. I walked around a corner, I could walk in on conversations periodically and -- excuse me -- and I heard, I believe it was Mr. Ambrose use the "N" word one time as far as dealing with a citizen in south central Elkhart. · And, of course, as soon as they saw me when I walked around the corner, the conversation ceased.

203.   The Wolverines espoused racist beliefs and targeted people of color. The Wolverines had a reputation within the Department for being "very proactive officers as far as their work within the south-central area."  Given their penchant for misconduct, Mr. Ivory came to question the legitimacy of any investigation conducted by members of the Wolverines.

204.   Defendant City never conducted any investigation into the Wolverines.

205.   The former Internal Affairs ("IA") Lt. Paul Converse reveals that he believed a "cop gang" existed within the Elkhart Police Department.

206.   As Mr. Converse revealed, even though he was on notice of a "cop gang" and the Wolverines, he never conducted a formal nor informal investigation into either.

207.   Even though the Chiefs of Police were on notice of the existence of the Wolverines, a "cop gang," none requested that a formal nor informal investigation be conducted.  So, nothing was done.

208. That failure directly led to Plaintiff's constitutional rights being violated.

209. Defendant City's current Assistant Chief of Police, Todd Thayer, was a member of the Wolverines.

210. Defendant City's continued employment of Mr. Thayer, and promotion of Mr. Thayer to Assistant Chief of Police, is evidence of the widespread culture of misconduct that infects the Elkhart Police Department.

211. Defendants' retaliation against Plaintiff is part and parcel to this widespread systemic pattern of police misconduct that infects the Elkhart Police Department.

## A Federal Jury Has Already Determined that Defendant City of Elkhart Violated Christopher Parish's Constitutional Rights

212. A federal jury has already determined that Defendant City's failures led to the violation of citizen's constitutional rights.

213. On September 24, 2007, Christopher Parish filed a federal civil-rights action arising from his wrongful conviction against Elkhart Police Officer Defendants Rezutko, Ambrose, Cutler, and the City of Elkhart. *See Parish v. City of Elkhart, et al.,* Case No. 07-cv-452 at Dkt. No. 1.

214. In that suit, Mr. Parish alleged that various defendants, including Defendant City of Elkhart, violated his constitutional right to a fair trial and due process of law by fabricating evidence, coercing witnesses, conducting photo-arrays that were improper and unduly suggestive, and by withholding exculpatory evidence.

215.    Mr. Parish alleged that the defendant officers engaged in such misconduct pursuant to the policies, practices and customs wrongfully maintained by the Defendant City of Elkhart.

216.    Mr. Parish was ultimately afforded a trial on his claims against Defendants City of Elkhart and Stephen Rezutko.

217.    Mr. Parish presented three *Monell* theories before a jury in his federal civil trial: 1) that the policy maker, Chief Bechtel, turned a blind eye to misconduct and did nothing about it, thus allowing Defendant Rezutko to violate Mr. Parish's constitutional rights; (2) that the City of Elkhart failed to train its employees, thus allowing an untrained Defendant Rezutko to violate Mr. Parish's constitutional rights; and (3) that the City of Elkhart had a custom and practice of withholding exculpatory information, thus causing the violation of Mr. Parish's constitutional rights.

218.    On October 27, 2010, a jury found in favor of Mr. Parish and against Defendant Rezutko.  On Mr. Parish's policy and practice claim against Defendant City of Elkhart, the jury once again found in favor of Mr. Parish.

219.    The Seventh Circuit Court of Appeals affirmed the jury's liability determinations against Defendants Rezutko and the City of Elkhart on December 20, 2012.  *See Parish v. City of Elkhart*, 702 F.3d 997 (7th Cir. 2012).

### The City of Elkhart Failed to Provide Sufficient Training and Supervision and Has Exhibited Deliberate Indifference

220.    The constitutional injuries Plaintiff suffered were caused by the policies and practices of the Elkhart Police Department.

221.    Indeed, within the Elkhart Police Department, there was a policy and practice of taking shortcuts to close criminal investigations, including by fabricating statements, coercing witnesses and/or suspects during interrogations, and withholding exculpatory and impeachment evidence.

222.    Policymakers and supervisory personnel were aware of and failed to curb the improper investigative practices that led to the numerous *Brady* violations.

223.    The problems that Defendants engaged in were common knowledge at the Elkhart Police Department.  This includes the Department's most senior leadership.

224.    This policy and practice repeated itself in numerous criminal investigations at the Elkhart Police Department.

225.    Nonetheless, and despite notice to (and often involvement of) policymakers in the above-described unconstitutional policies and practices, there was no effort to rectify any such misconduct.  Nonetheless, Defendants were permitted to act with impunity in criminal investigations.

226.    The City of Elkhart and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.

227.    They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

228.   The policies and practices described in the foregoing paragraphs were consciously approved by City of Elkhart policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

229.   Those policies and practices were the proximate cause of the constitutional injuries that Plaintiff sustained, as described more fully above.

230.   Moreover, the City's failure to train its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case.

231.   Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

## Plaintiff's Damages

232.   As a result of Defendants' misconduct, Plaintiff must now attempt to rebuild her life.

233.   Plaintiff has suffered tremendous mental, emotional, financial, and reputational damages, including but not limited to: lost income, lost retirement funds from police pension plan, insurance, reputational damage, physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

234.   Defendants intentionally and/or recklessly, directly and proximately caused Plaintiff, assaulted, confined, retaliated against, and endured the loss of her employment and livelihood.

235.    The Defendants' actions caused Plaintiff to suffer physical harm, including physical ailments and unauthorized physical contact resulting from the circumstances and duration of her confinement and the violation of her constitutional rights, and to fear for her physical safety throughout the period of her confinement.

236.    The Defendants' actions caused Plaintiff to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, ongoing depression and the continued effects of post-traumatic stress disorder, loss of police officer certification, increased pension payments, insurance coverage, and additional retirement plan compensation.

### Count I - 42 U.S.C. § 1983
### First Amendment Retaliation
### All Defendants

237.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

238.    The First Amendment to the United States Constitution guarantees Plaintiff's right to speak out on matters of public concern without fear of unjust retaliation.

239.    As described more fully above, Plaintiff engaged in extensive protected speech on matters of public concern by reporting on the criminal misconduct and corruption of others in the Elkhart Police Department.

240. As described more fully above, Plaintiff engaged in extensive protected speech on matters of public concern when she testified at the Board of Public Safety hearing regarding police misconduct at the Elkhart Police Department.

241. As a result of Plaintiff's exercise of protected speech, Defendants retaliated against Plaintiff in the manner described in the preceding paragraphs.

242. Retaliation against Plaintiff was devised, approved, and carried out by individuals with final policymaking authority with respect to the actions taken, including Chief of Police, Defendant Seymore, and the elected Elkhart County Prosecutor, Defendant Becker.

243. The misconduct described above in this Count was the result of Defendant City's deliberate indifference to the policies and widespread practices described more fully above and below, in that:

    a. Municipal policymakers are aware of, condone, and facilitate by their inaction a "code of silence" in the Elkhart Police Department, by which officers understand that they should cover for each other unconditionally and that failure to do so amounts to a betrayal.

    b. Municipal policymakers are aware of, condone, and facilitate by their inaction, the enforcement of the "code of silence" within the Department through retaliation against officers who do report the misconduct of other officers.

    c. Defendant City has recognized the existence of a "code of silence" within the Elkhart Police Department but has failed to take the

necessary steps to protect officers who break the "code of silence" and suffer retaliation as a result.

d.  As a matter of both policy and practice, Defendant City directly encouraged, and was thereby the moving force behind the very type of misconduct at issue here by failing to adequately supervise, discipline, and control its officers, such that its failure to do so manifests deliberate indifference.

e.  As a matter of both policy and practice, Defendant City facilitated the very type of misconduct at issue here by allowing it to continue as a matter of practice within the department, thereby leading officers to believe that the "code of silence" will be enforced throughout the department, and in that way, directly encouraging future abuses.

f.  As a widespread practice so prevalent as to compromise municipal policy, officers of the Elkhart Police Department who have dared to speak out about the misconduct of others have experienced retaliation a manner similar to that alleged by Plaintiff.

244.  These widespread practices, so well-settled as to constitute *de facto* policy in the Elkhart Police Department, were able to exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to these problems, thereby effectively ratifying them.

245.    The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal Defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

246.    As a result of the aforementioned deprivation of federal rights, Plaintiff has suffered and is likely to suffer injuries including but not limited to lost wages, emotional distress, and physical distress.

## Count II – 42 U.S.C. § 1983
### Supervisory Liability: Defendants Seymore, Milanese, Whitmyer, Hamlin, Wrathel, Claybaugh, Houser, Roundtree, Young

247.    Each paragraph of this Complaint is incorporated as if restated fully herein.

248.    At the time of the underlying allegations, Defendants Seymore, Milanese, Whitmyer, Hamlin, Wrathel, Claybaugh, Houser, Roundtree, and Young were Supervisory Defendants in the EPD.

249.    The Defendant Officers misconduct was caused by the deliberate indifference and recklessness of Supervisory Defendants, including but not limited to failing to adequately train Defendants.

250.    Specifically, the Supervisory Defendants were personally involved in the underlying allegations of misconduct and/or Plaintiff's grievance process, in the absence of their deliberate indifference and recklessness, should have known of his subordinates' unconstitutional actions and related misconduct in the case.

251.    Furthermore, the supervisory Defendants failed to supervise the Defendant Officers in constitutionally adequate law enforcement practices,

particularly those concerning the interviews of witnesses, the preparation of

forensic reports and the production of exculpatory evidence, thereby encouraging

and/or permitting these employees and other Defendants to engage in a reckless

investigation, to coerce and fabricate false inculpatory evidence and to withhold

exculpatory and impeachment evidence, which caused the constitutional

deprivations suffered by Plaintiff.

252.    These interview techniques, failures in producing exculpatory

evidence, fabrications and other investigative procedures were contrary to accepted

methods used by law enforcement agencies.  The fact that the Defendant

supervisors failed to train and supervise subordinates to ensure that they employed

proper investigation procedures demonstrates deliberate indifference and reckless

disregard for Plaintiff's constitutional rights.

253.    The personal involvement of the Defendant supervisors, through their

actions and omissions, proximately and directly caused the constitutional

deprivations and grievous personal injuries suffered by Plaintiff, including the

above-mentioned injuries and damages.

254.    The misconduct described in this Count was objectively unreasonable,

and was undertaken intentionally, with malice, willfulness, and deliberate

indifference to Plaintiff's clearly established constitutional rights.

### Count III - 42 U.S.C. § 1983
### Failure to Intervene: All Defendants

255.    Each of the Paragraphs of this Complaint is incorporated as if restated

fully herein.

256.    In the manner described above, during the constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

257.    Because of the Defendants failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.

258.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's rights.

259.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Elkhart Police Department in the manner described more fully in the preceding paragraphs and was tacitly ratified by policymakers for the Municipal Defendants with final policymaking authority.

### Count IV - 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights: All Defendants

260.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

261.    After Plaintiff refused to commit misconduct, Defendants reached an agreement amongst themselves to retaliate against Plaintiff thereby depriving her of her constitutional rights, all as described in the various Paragraphs of this Complaint.

262.    In this manner, the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

263.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts as described in this Complaint and was an otherwise willful participant in joint activity.

264.    As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and she suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

265.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

266.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Elkhart Police Department in the manner described more fully in the preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

## Count V - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant City of Elkhart

267.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

268.    The actions of the Elkhart Police Officers in committing misconduct and violating Plaintiff's constitutional rights were undertaken pursuant to the policies and practices of the Elkhart City Police, described above, which were created, maintained, or ratified by policymakers for the City of Elkhart with final policymaking authority.

269.    The policies and practices described in this Count were maintained and implemented by the City of Elkhart with deliberate indifference to Plaintiff's constitutional rights.

270.    As a direct and proximate result of the City of Elkhart's actions, Plaintiff's constitutional rights were violated and she suffered injuries and damages, as set forth in this Complaint.

271.    The City of Elkhart is therefore liable for the misconduct committed by its officers.

### COUNT VI
### Intentional Infliction of Emotional Distress: All Defendants

272.    Plaintiff hereby incorporate by reference the foregoing paragraphs and further allege as follows.

273.    Defendants intentionally and/or recklessly, directly and proximately caused Plaintiff, assaulted, confined, retaliated against, and endured the loss of her employment and livelihood.

274.    The Defendants' actions caused Plaintiff to suffer physical harm, including physical ailments and unauthorized physical contact resulting from the circumstances and duration of her confinement and the violation of her constitutional rights, and to fear for her physical safety throughout the period of her confinement.

275.    The Defendants' actions caused Plaintiff to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, ongoing depression and the continued effects of post-

traumatic stress disorder, loss of police officer certification, increased pension payments, insurance coverage, and additional retirement plan compensation.

**WHEREFORE**, Plaintiff JOY PHILLIPS, respectfully requests that this Court enter judgment in her favor and against Defendants CITY OF ELKHART, KRIS SEYMORE, TRAVIS HAMLIN, ANDREW WHITMYER, SCOTT CLAYBAUGH, JAMES WRATHEL, DENISE HOUSER, MICHAEL VANSCOIK, DUSTIN YOUNG, BRANDON ROUNDTREE,VICKI BECKER, in their individual capacities, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## **JURY DEMAND**

Plaintiff, JOY PHILLIPS, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Elliot Slosar
*One of Plaintiff's Attorneys*

Jon Loevy
Elliot Slosar
Margaret E. Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902